**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

March 31, 2022

**VIA ECF**

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
New York, New York 10007

Re:   <u>United States v. Steve Rosado</u>, S1 21 Cr. 3 (JSR)

Dear Judge Rakoff:

*Steve has apologized to his family and friends on numerous occasions for the disappointment, embarrassment, the difficulty his actions have left all who know and hold him dear in and for shock this has caused. Yet, I wonder if Steve has apologized to himself for dashing the very hope and dreams that propelled him to strive and reach further than perhaps, he would have imagined given the trauma he lived, the health issues he has and the endowed intellect he has been given.*

-*Letter of Manuel Martinez, cousin of Steve Rosado*

After a life of abuse and abandonment, Steve Rosado had finally figured his life out. Mr. Rosado had stable employment as a paralegal for an immigration practice, an apartment of his own, a girlfriend, and a thriving social life. *See* Ex. A, Letter of Steve Rosado. He was riding on a high that he had not experienced in his life, which had been previously marred by abuse, abandonment, and imprisonment. However, in March 2020, Mr. Rosado's life took a turn for the worse with the pandemic. The mandatory quarantine left him isolated and alone in his home. He had to take a pay cut from his job and work primarily from home, losing the valuable connections he had with his colleagues. He and his girlfriend broke up, as she was too afraid to leave her apartment and have contact with him anymore for fear of contracting COVID. Finally, he lost his social life – a significant part of his life that kept him grounded in a community of adults with similar interests. It was against this backdrop of loneliness, depression, and despair that Mr. Rosado committed the instant offenses for which he is deeply remorseful.

Mr. Rosado stands before this Court having pled guilty to one count of attempted enticement of two minors, in violation of 18 U.S.C. 2422(b) and 2, and one count of attempted receipt of child pornography, in violation of 18 U.S.C. 2252A(a)(2)(B), 2252A(b)(1), and 2. The

1

attempted receipt of child pornography count carries a mandatory minimum sentence of 180 months, or 15 years. The United States Probation Office has calculated the Guidelines to be 292 to 365 months and recommends a bottom of the Guidelines sentence of 292 total months in prison for all counts, or over 24 years in prison. See Presentence Report ("PSR") at 26.

The defense requests that Your Honor sentence Mr. Rosado to 180 months' or 15 years' imprisonment – a sufficiently harsh sentence. Within our guidelines system, with the adding and subtracting of levels creating the illusion that the most human problems can somehow be addressed with mathematical precision, it is sometimes easy to lose sight of the sheer magnitude of sentences—Mr. Rosado's mandatory minimum sentence is 15 years, a decade and a half in prison. This is a substantial, severe, and meaningful sentence. It is completely sufficient to address all of the legitimate aims of sentencing and appropriately considers (1) the nature and circumstances of Mr. Rosado's life, (2) the nature and circumstances of his crime, (3) how he has conducted himself since he was arrested and while incarcerated, (4) his crime as compared to similarly situated defendants, and (5) the horrific conditions of confinement he has endured during pretrial incarceration. We therefore respectfully urge the Court to sentence Mr. Rosado to 15 years' imprisonment.

## Background

Steve Rosado was born to his parents, Sandra Gutierrez and Elvis Rosado, in Brooklyn, New York on November 12, 1979. His parents were only fifteen years old when Steve was born, and they struggled to care for him. In addition to caring for a small child at such a young age, Mr. Rosado's mother suffered from lupus due to a bad blood transfusion. When Mr. Rosado was three, his parents separated. His father moved in with his common law wife and their children.

Meanwhile, Mr. Rosado's mother entered into a series of unhealthy and abusive relationships. She first dated John Ladines, who was an alcoholic, an abuser, and a cheater. On one occasion, Mr. Rosado recounts that John raped his mother against her will. This abusive relationship rendered his mother suicidal. Indeed, Mr. Rosado, who was only about nine years old, was present when his mother attempted suicide by swallowing pills. Fortunately, her attempt was unsuccessful, but it made a lasting impact on Mr. Rosado, who took on the role of a parentified child for his mother. John's abuse, however, was not limited to Mr. Rosado's mother. Indeed, John physically abused and neglected Mr. Rosado and treated him as though he was a burden. At one point, John's abuse became so bad that he beat Mr. Rosado to the point of a concussion. During this tumultuous relationship, Mr. Rosado's mother and John bore a child, Johnathan, together. But after one year, John left their family. Mr. Rosado, then just ten years old, became responsible for his baby brother.

His mother then married Freddie Rojas, an abuser and addict. Their relationship was rife with violence and neglect. One day, Freddie left twelve-year-old Mr. Rosado in front of a crack house so that he could get high. Another time, Freddie beat his mother so badly she was confined to her bed for a week. When Mr. Rosado tried to protect his mom, Freddie would attack him as well. Once, Freddie choked Mr. Rosado's mother and attempted to kill her. It was only due to Mr.

2

Rosado's intervening that his mother was saved.  When Mr. Rosado was seventeen, Freddie began dealing drugs and his mother ultimately divorced him.

That summer, in 1997, Mr. Rosado enrolled in Hofstra University. He performed well, but soon his mother became deathly ill with a diagnosis that she refused to disclose. She tried to hide her sickness from her family, confiding only in Mr. Rosado. Unbeknownst to the rest of his family, for about three years he would leave college on the weekends to shop, cook, and clean for his mother and care for Johnathan. Eventually, he took a leave of absence from school to help his mom. Ultimately, Mr. Rosado learned that his mother had contracted HIV/AIDS from Freddie. On June 20, 2000, during his junior year of college, she died.

His mother's death shattered him. Mr. Rosado had no emotional support system to prepare for her death or to grieve her passing.  As his cousin Manuel Martinez describes it, Mr. Rosado's mother was "his primary caretaker, support, defender, and as I later discovered, his *raison d'être*." Ex. B at 5, Letter of Manuel Martinez.  His friend Jessica notes that Mr. Rosado "still gets emotional to this day when discussing his mother, for she was the only person in his life to truly provide the love, support and guidance a young man needed growing up." Ex. B at 8-10, Letter of Jessica R.   Upon losing his mother, Mr. Rosado also functionally lost his brother, who moved in with his father after the death. Since Mr. Rosado and John were estranged, he lost contact with Jonathan.

Mr. Rosado struggled to finish college in light of his family tragedy, but was able to push through and graduate from Hofstra University in 2001 with a Bachelor of Arts in Asian Studies and Political Science. *See* Ex. C, Education Records. Upon graduation, he worked as a licensed stockbroker with a Series 7 and Series 63 license—a trade he had begun practicing in college. However, following the September 11, 2001 attacks, Mr. Rosado left this field.

During this period, Mr. Rosado was struggling. Unmotivated and directionless, he worked a series of odd jobs at Best Buy, Kodak, a gubernatorial campaign, and an AMC movie theatre. The weight of carrying his mother's burden alone for three years, ultimately losing his mother, and functionally losing his brother, had sunk in. He did not confide in anyone about his inner turmoil. Instead, Mr. Rosado turned to pornography to escape from his feelings. At some point, he found child pornography.

In January 2004, Mr. Rosado was convicted in Queens County of possessing a sexual performance by a child less than sixteen years of age under Penal Law § 263.16. At the time of the offense conduct, he was twenty-two years old. He was sentenced to six months in jail followed by ten years of probation.

Also during this period, Mr. Rosado began exchanging messages with a fourteen-year-old girl. He was then twenty-three. For approximately a year, Mr. Rosado engaged in an inappropriate sexual relationship with her. After an anonymous 911 call reported their relationship in October 2004, Mr. Rosado was arrested. Following a jury trial, on August 30, 2005 Mr. Rosado was convicted in New York County of rape in the second and third degree and endangering the welfare of a child, and sentenced to an aggregate term of 64 months to 14 years in prison. His probation for his Queens County conviction was also violated, and he was resentenced to 1-3 years in prison.

While incarcerated, Mr. Rosado completed a two-year intensive sex offender treatment program at Gowanda Correctional Facility. Through therapy, he understood the emotional and physical toll of his actions on others and that his behavior was completely inappropriate. Mr. Rosado's time in prison also allowed him to develop the goal of becoming an attorney, which served as a fundamental component of his release plan. He developed this dream while serving as a clerk in the law library, a position he maintained for many years; he went on to earn a Paralegal Certificate from the Blackstone Career Institute while still in prison. *See* Ex. D, DOCCS Records. Mr. Rosado also received excellent evaluations in his work as a classroom assistant, where he tutored other inmates. *Id.* Reflecting this positive institutional involvement, Mr. Rosado maintained a nearly spotless disciplinary record.

Upon his release to parole on October 18, 2013, Mr. Rosado engaged in sex offender treatment for a second time. From December 2013 until June 2018, he participated in intensive outpatient counseling with Shiloh Consulting. *See* Ex. E, Shiloh Consulting Records and Certificate. His discharge evaluation reports that his "active participation in treatment had creative positive change resulting in him moving through all of the phases of treatment." Ex. E. Mr. Rosado "developed a solid relapse prevention plan, identified those factors that led to his offense, his previous dysfunctional relationships, and his inability to gain support from others." *Id.* His treatment provider concluded that he "has demonstrated tremendous progress" and was "able to complete all of the goals he had set for himself in treatment." *Id.*

While there was a point that Mr. Rosado was estranged from his family, Mr. Rosado rekindled his relationship with his father and brothers upon his release from state custody. Mr. Rosado and his father speak regularly and maintain frequent contact even while Mr. Rosado has remained detained in the instant matter. While his father currently lives in Florida, he provides him with as much emotional support as possible. *See* Ex. B at 1-2, Letter of Elvis Rosado, Sr. Likewise, he also speaks regularly with his brother, Elvis Rosado, Jr. Elvis Jr. sees "how hard [Mr. Rosado] worked to make something of himself during his adult years." *See* Ex. B at 3-4, Letter of Elvis Rosado, Jr.

In the years since his release, Mr. Rosado focused on his long-term goal of becoming a lawyer. In 2015, he enrolled at Touro College to pursue a degree in Paralegal Studies and eventually earned his Associates Degree after making the Dean's List. *See* Ex. C. While at Touro, he began interning as a paralegal in the Law Office of Gary S. Villanueva, a position that later turned into a full-time job. *See* Ex. B at 14-15, Letter of Gary S. Villanueva, Esq. In his letter, Mr. Villanueva describes how Mr. Rosado initially began working with him as an unpaid paralegal through a program for young men recently released from prison. *Id.* Mr. Rosado's legal research and writing skills were so impressive that Mr. Villanueva offered him a paid position at the conclusion of the internship program to work for him as his full-time paralegal. *Id.* Mr. Villanueva notes that he was "always impressed by his work product and his diligence," asserting that Mr. Rosado was "an asset to [his] office and [his] clients." *Id.* This was particularly impressive to Mr. Villanueva as Mr. Rosado's life outside of work was challenging given his living conditions. Indeed, at this time, Mr. Rosado was living a group housing setting with other men who had recently been released from prison. With electrical issues and terrible housing conditions, Mr. Rosado "took on the fight on behalf of himself and other tenants who were being taken advantage of given their criminal backgrounds." *Id.*

In 2017, Mr. Rosado left Mr. Villanueva's criminal practice to pursue other legal opportunities. *Id.* Mr. Rosado began working at the Law Office of Thomas J. Goodman where he would regularly attend Continuing Legal Education courses on topics from civil commitment to criminal procedure in order to broaden his legal knowledge. Later on, and at the time of his arrest, Mr. Rosado was working as an immigration paralegal at the Law Office of Adam Kopchian. In his letter, Mr. Kopchian describes Mr. Rosado's work ethic as "tenacious" and his involvement in assisting with the legal representation of immigration clients as "instrumental." Ex. B at 16, Letter of Adam Kopchian, Esq.. Mr. Kopchian particularly grieved the loss of Mr. Rosado's talents to detention "considering how many lives he's changed previously by helping SIJS applicants obtain status in the United States who've been abused, neglected, and/or abandoned by their natural parents." *Id.* Similarly, Mr. Rosado's other colleagues noticed the same level of dedication to his immigration clients, noting that he would often spend late nights at the office working after everyone had left and even risking his own safety and wellbeing by returning to the office to work on cases during the COVID-19 pandemic. *See* Ex B. at 17, Letter of Mahbub Ahmed; Ex. B at 20-21, Letter of Louisa Wu, Esq.; Ex. B at 18-19, Letter of Paul Gilmer, Esq.

With the assistance of legal counsel, Mr. Rosado also filed a petition seeking the modification of his risk assessment level in New York State. In requesting this modification from a level three (the strictest reporting level) to a level 2, Mr. Rosado cited his demonstrated ability to lead a crime-free life, compliance with SORA requirements, successful completion of sex offender treatment both in and out of prison, his stable employment as a paralegal, and his strong family ties. *See* Ex. K, Updated Board of Sex Offenders Recommendation. After reviewing his motion, the Board of Sex Offenders in New York State agreed not to oppose a reduction to a level 2 designation. *Id.* Given the Board's determination, Judge Merchan granted Mr. Rosado's motion for modification and reduced his SORA risk level from three to two. *See* Ex. F, Supreme Court of the State of New York Order Modifying Level of Notification.

In addition to focusing channeling much of his energy towards work, Mr. Rosado had begun participating in new pro-social activities, such as guitar lessons with other adult learners. These lessons gave him a sense of community, helping him to rebuild healthy social connections. Mr. Rosado would also attend Comic Con events and "hang[] out with friends at movies, concerts, and network events." Ex. A. However, the collegial work environment and social activities came to halt with the advent of COVID. As Mr. Rosado described it, "[o]nce the pandemic hit, I was forced into isolation and spent a lot of idle time online rather than with life." Ex. A.

While Mr. Rosado loved his work as an immigration paralegal, his experience became increasingly difficult during the lockdown. First, Mr. Rosado suffered a pay cut due to the financial impact of the quarantine on his employer. Worse, Mr. Rosado, who had been working in an office with colleagues and socializing with others, became confined to his home.

The isolation only deepened when in April 2020, his close friend of 22 years, Omar Palmer, died of COVID-19 while working as a Border Patrol Officer in New York. *See* Ex. A. This death took a heavy toll on Mr. Rosado as they had met their first year of college at Hofstra University and remained close friends since. *See* Ex. A. Working at home alone as well as the death of his

longtime best friend due to COVID, was triggering for Mr. Rosado. Indeed, the intense isolation caused him to retreat to online chat rooms.

It was online, through the Whisper app, in October 2020 – seven months into the pandemic – that Mr. Rosado began communicating with persons (per the PSR, one of the people that presented themselves as a girl was in fact an adult male) that identified themselves as females under the age of 18. Mr. Rosado would communicate with them via app messaging and ask them to send him photos, some of which were sexual in nature. Around that same time, on November 29, 2020, Mr. Rosado began speaking with the undercover agent in this case. The agent, posing as the mother to two daughters, 12 years old and nine years old, was a welcomed interaction for Mr. Rosado, who had spent the last eight months in quarantine living alone in his apartment. Eventually, the parties agreed to meet at a future date at which time Mr. Rosado hoped to engage in sexual activities with her and her daughters. On December 7, 2020, after Mr. Rosado met with the agent at a bar, he was arrested.

### **Fifteen Years is an Appropriate Sentence**

Congress requires District Courts to impose a sentence that is "sufficient, but not greater than necessary . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a) (emphasis added). The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

When determining the appropriate sentence, District Courts must consider the Federal Sentencing Guidelines, but need not abide by them. *See United States v. Booker*, 543 U.S. 220, 264 (2005). District Courts vary or depart from the guidelines quite frequently -- in fact, the majority of federal sentences are now outside of the guidelines range. *See* U.S. Sent'g Comm'n, Quarterly Sentencing Updates, available at https://www.ussc.gov/research/data-reports/quarter /quarterly-sentencing-updates. The U.S. Sentencing Commission's preliminary report for 2021 found that guidelines sentences were imposed in only 43.1% of cases nationally, and just 19.5% of cases in the Southern District of New York. *See id.* This trend has been stable over the past several years. Since 2013, SDNY judges have consistently sentenced approximately 75% of their defendants outside of the guidelines range. *See id.*

In this case, a downward variance is appropriate. Specifically, we respectfully request a sentence of 15 years plus a term of supervised release. Such a sentence is warranted because it will account for Mr. Rosado's life history, the nature of the instant offense, his conduct throughout his incarceration, and it will accurately reflect the abnormally punitive nature of Mr. Rosado's pretrial incarceration.

I.  **The Nature and Circumstances of Mr. Rosado's Crime Calls for a Sentence of 15 Years in Prison.**

Mr. Rosado made truly awful decisions and committed very serious crimes. Because of these crimes, he acknowledges that a lengthy sentence is appropriate. Given all of the facts, however, the Guidelines sentence – which, at the bottom end, would release Mr. Rosado when he is nearly 70 years old – is simply not an appropriate punishment for this crime.

In considering the offense, and comparing Mr. Rosado's case to other similarly situated defendants in this District, punishing Mr. Rosado for more than 15 years is greater than necessary to meet the goals of our sentencing regime. Mr. Rosado is 43 years old. He did not groom anyone, meet them, rape them, or take photos of them. Rather, Mr. Rosado, in the midst of deep isolation and depression, sat in chatrooms talking to an agent who posed as the mother of two fictious daughters and asking people he believed to be girls to send photos of themselves.  Still, the Guidelines would release Mr. Rosado when he is nearly 70 years old into the community.  To appreciate how astonishing and disproportionate that range is, the Court should bear in mind that if Mr. Rosado had committed murder his Guidelines range would be substantially lower. Indeed, if it were second-degree murder, his Guidelines range in criminal history category V (after acceptance of responsibility) would be 262–327 months and there would be no mandatory minimum. See U.S.S.G. § 2A1.2; 18 U.S.C. § 1111(b). On a murder-for-hire conspiracy, the range would begin at 151 months, less than the 15-year mandatory minimum applicable in this case. See § 2A1.5.

This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009).  The Second Circuit has held that the child pornography guideline "is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).  Extending that reasoning, the Circuit held that a within-guidelines child pornography sentence was substantively unreasonable. *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017).  The Sentencing Commission itself has recognized that the child pornography Guideline leads to unduly harsh sentencing recommendations and should be revised. *See* U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012).[1]

In this case, the Guideline range merits little deference because § 2G2.1, the production Guideline, suffers from the same deficiencies as § 2G2.2, the possession Guideline. *See Dorvee*, 616 F.3d at 184.  First, § 2G2.1 does not reflect the Sentencing Commission's usual "empirical approach," but rather implements a series of Congressional directives to establish "harsher

---

[1] *Available at*: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

penalties" for production offenses. *Id.*; *see also* 2012 Report, at 249. As first promulgated, § 2G2.1 carried a base offense level of 25. In 1996, Congress required the Commission to increase the base offense level to 27. Sex Crimes Against Children Prevention Act of 1995, § 2, Pub. L. No. 104-71, 109 Stat. 774; U.S.S.G. App. C, amend. 534 (1997). Then in 2004, in response to Congress's decision to increase the mandatory minimum for § 2251 offenses from 10 to 15 years, the Sentencing Commission raised the base offense level to 32. *See* PROTECT Act, § 103(b)(1)(A), Pub. L. No. 108-21, 117 Stat. 650, 653 (2003); U.S.S.G. App. C, amend. 664 (2004). Similarly, Congress, not the Commission, prompted the adoption of the two-level enhancement for use of a computer, § 2G2.1(b)(6), *see* Sex Crimes of Children Prevention Act of 1995, § 3, 109 Stat. at 774; U.S.S.G. App. C, amend. 534; and the four-level enhancement for sadistic material, § 2G2.1(b)(4), *see* PROTECT Act, § 401(i)(1)(B), 117 Stat. at 672-73; U.S.S.G. App. C, amend. 664. Thus, an increased total of **13 levels** (seven in the base offense level and six in common enhancements) derive from Congress, not the Commission.

Second, these § 2G2.1 enhancements "apply to the vast majority of defendants." *Dorvee*, 616 F.3d at 186. Of all the sentences under § 2G2.1 in the fiscal year 2017, 99.9% started with a base offense level of 32, but then 99.0% of the cases included specific offense characteristic upward adjustments. *See* U.S. Sent'g Comm'n, Use of Guidelines and Specific Offense Characteristics 44–47 (2017) *available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/ Full_Report_to_Congress.pdf. Specifically, 90% involved a two- or four-level age-of-victim enhancement, § 2G2.1(b)(1), and 49.8% involved misrepresentations/use of a computer, § 2G2.1(b)(6), i.e. the same enhancements applied in this case.

Considering all of the Section 3553(a) factors and the problems with the production Guideline, the Guideline range in this case is far too high. However, when comparing Mr. Rosado's conduct to other similarly situated defendants, it becomes clear that 15 years is the only appropriate sentence. A study of recent cases demonstrate that Mr. Rosado's conduct was less serious than the individuals discussed below and therefore should receive a punishment less severe:

- *United States v. Khan*, 15 Cr 804 (JSR). The defendant met the victim online when she was 11 years old and groomed her for multiple years. When she was fifteen years old, he traveled to a foreign country to have sex with her. He convinced her to transmit live nude images of herself to him over the internet. He also made advances to other underage girls online. With a 15-year mandatory minimum, Your Honor sentenced the defendant to 206 months, or 17 years.[2]

- *United States v. Hope*, 15 Cr 888 (SHS). In this case the Guideline range was 360 months to life. The defendant operated a sex trafficking ring with multiple victims that repeatedly exploited minor girls using threats of violence. He posted lurid photos of the minor girls in

---

[2] All information discussed in these case summaries were found in the Government's sentencing submissions or indictment for each case from the ECF dockets.

advertisements an attempt to lure customers to have sex with the minors. Judge Stein sentenced the defendant to 216 months, or 18 years.

- *United States v. Cruz*, 15 Cr 338 (PKC). The defendant in this case was a high school teacher in the Bronx. He encouraged a dozen young boys to produce nude photographs on the internet. He often posed as a teenager himself to get them to send photographs, and he did so at times when on school grounds and serving as a teacher. Judge Crotty sentenced him to 84 months, or 8 years.

- *United States v. Montgomery*, 14 Cr. 771 (JPO). The defendant solicited and received explicit images from minor victim via instant messaging program for several years; made two trips to visit victim in her home country, Peru, where he had sexual intercourse with her when she was 16 and 17 years old; he then made video recordings of the victim performing oral sex on him and uploaded those videos to internet, using victim's name. He also instructed others on how to entice minors on the internet. Judge Oetken sentenced the defendant to 180 months, or 15 years.

- *United States v. Cardona*, 14 Cr. 314 (RA). The defendant induced an 11-year-old boy to send him explicit photos via internet. Separately, the defendant, who was HIV positive, engaged in oral sex with 14-year-old boy on 10–20 occasions over a year, videotaped the abuse, and uploaded video to internet. The defendant also admitted to (uncharged) sexual contact with several children he supervised at afterschool program. Judge Abrams sentenced the defendant to 210 months, or 17.5 years following trial conviction on two counts of production, and one count each of distribution, receipt, and possession.

- *United States v. Wang*, 11 Cr 730 (PGG). The defendant operated a child pornography website where he advertised and hosted child pornography. As part of this scheme, he made over $750,000 in profits. Judge Gardephe sentenced the defendant to 210 months, or 17.5 years.

- *United States v. Correa*, 08 Cr. 1026 (HB). The defendant drugged his 10-year-old nephew and, along with three other men, molested him, photographed abuse, and uploaded images to Internet. The defendant had been previously charged with possessing child pornography in the past. Judge Baer sentenced him to 15 years.

- *United States v. Griffith*, 99 Cr. 786 (HB). Defendant brothers recruited teenage girls to work as prostitutes and videotaped one performing oral sex on them. Following trial convictions on § 2251(a) and several other offenses, defendants were sentenced to 126 and 120 months. (Section 2251(a) then carried a 10-year mandatory minimum.).

Comparing Mr. Rosado's conduct to the defendants' actions described above, even in the category of the nature and circumstances of the offense—not accounting for the other important mitigating factors that favor a lower sentence—15 years is an appropriate punishment. This is

especially true in this instance, where Mr. Rosado may face civil confinement at the conclusion of his federal sentence. Indeed, if Mr. Rosado requires additional treatment or confinement at the conclusion of his sentence, the BOP should be allowed to make that determination after 15 years of confinement.

### II. A Sentence of 15 Years in Prison Will Deter Mr. Rosado from Committing Further Crimes and Generally Deter the Public from Committing Similar Crimes.

Mr. Rosado has fully learned his lesson. Since his arrest, he has worked tirelessly to right his wrongs. Research shows that a more severe sentence does not lead to greater specific deterrence for individual defendants. *See* The Honorable Peggy Fulton Hora & Theodore Stalcup, *Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts*, 42 GA L. REV. 717, 724 (2008). The same can be said for general deterrence. Studies have proven that more severe sentences do not result in greater general deterrence. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). Evidence-based studies strongly support the conclusion that it is the *certainty* of being prosecuted rather than the severity of punishment that deters crime. The fact that Mr. Rosado was prosecuted and punished will provide sufficient general deterrence; additional incarceration is not required.

To the extent, however, that the Court believes deterrence is achieved through sentencing, it is evident that a 15-year sentence will be sufficient deterrence for Mr. Rosado. Indeed, the previous nine-year sentence Mr. Rosado served deterred him from reoffending as it was only the once-in-a-lifetime circumstances of a global pandemic that mandated isolation from his friends, girlfriend, and social outlets, which led him down this path that he had successfully avoided for years. Notably, Mr. Rosado had been so successfully deterred from reoffending that he even received a reduction of his SORA level from a level three to a level two due to the Board of Sex Offender's and State Supreme Court's assessment that he presented a reduced risk of recidivating. *See* Ex. F, Supreme Court of the State of New York Order Modifying Level of Notification. Given Mr. Rosado's demonstrated history of successful reintegration and deterrence from reoffending, a 15-year sentence will be adequate punishment.

### III. Mr. Rosado's Age at the Time of Release Militates in Favor of a 15-Year Sentence.

A sentence to the mandatory minimum 15-year term will result in Mr. Rosado re-entering society at an age at which his risk of recidivism is extremely low. Age is a key predicator of recidivism across all categories of crime. Older offenders are "substantially less likely than

younger offenders to recidivate following arrest."[3] According to the National Institute of Justice, criminal behavior peaks in late adolescence (ages 15 to 19) before declining in the early 20s. *Id.* at 10. Criminal behavior then continues to decline over time. As a result, recidivism rates decline steadily as individuals age: "the older the age group, the lower the rearrest rate." *Id.* For example, the National Institute of Justice has found that 66.6% of offenders between the ages of 21 and 24 are rearrested following their release, as compared to 30.1% of 50 to 54 year olds. *Id.* at 23.

As with other crimes, "older sex offenders generally have lower rates of sexual recidivism than their younger peers."[4] Notably, given Mr. Rosado's age, sex offenders of Mr. Rosado's subtype—extrafamilial child molesters—"show relatively little decline [in rates of recidivism] until age 50."[5] But at age 50, their rates of recidivism plummet dramatically. *Id.* at 10. This drop off is demonstrated by the following chart:



Mr. Rosado is 43 years old. If given a mandatory minimum of 15 years, he will not be released until he is at least 57 years old—even assuming he received good time credit. At that age, his risk of recidivism will have decreased exponentially. Moreover, upon release, federal supervised release will require a greater level of compliance and supervision than was afforded to Mr. Rosado in the state. As such, while Mr. Rosado's age will significantly reduce his risk of recidivism, so will the tools at federal Probation's disposal, such as internet bans and internet monitoring programs, to directly target the behavior at issue upon his reentry into society. These monitoring tools, coupled with intensive therapy to address the physical and sexual trauma Mr. Rosado experienced and bore witness to at an early age, further alleviate concerns regarding

---

[3] United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at p. 3 (Dec. 2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.
[4] Alex J. Smethurst, Dr. Jennifer Bamford, Dr. Ruth J. Tully, *A Systematic Review of Recidivism Rates of Older Adult Male Sex Offenders*, Applied Psychology in Criminal Justice, at p. 41 (2021) *available at* file:///G:/16-1-2Smethurst.pdf_1615503001.pdf.
[5] R. Karl Hanson, *Age and Sexual Recidivism: A comparison of Rapists and Child Molesters*: *2001-01*, at p.16 (2001), *available at* https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/sxl-rcdvsm-cmprsn/sxl-rcdvsm-cmprsn-eng.pdf.

recidivism upon Mr. Rosado's release from prison in the distant future. Moreover, this conviction will still trigger the conditions upon Mr. Rosado's release to assist in his rehabilitation and protect the community, such as sex offender treatment and registration.

### IV. The Conditions of Mr. Rosado's Pretrial Detention Warrant a Significant Downward Variance

Even before the pandemic, the MDC had long been known to be "among the worst [jails] in the federal system." Annie Correal et al., *'It's Cold As Hell': Inside a Brooklyn Jail's Weeklong Collapse*, N.Y. Times, Feb. 9, 2019, *available at* https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html. The facility has been the subject of federal civil rights probes, *see, e.g.*, Off. Inspector Gen. U.S. Dep't Just., *The September 11 Detainees* 142-47 (2003), available at https://www.oig.justice.gov/reports/september-11-detainees-review-treatment-aliens-held-immigration-charges-connection (finding "a pattern of physical and verbal abuse" at the MDC), criminal prosecutions, *see, e.g.*, *United States v. Lopresti*, 340 F. App'x 30 (2d Cir. 2009) (affirming the conviction of an MDC guard who conspired with other guards to grievously beat an inmate and then fabricate evidence to blame his injuries on a suicide attempt), prison rights lawsuits, *see, e.g.*, Ord. Granting Class Certification, *Scott et al., v. Quay et al.*, 19 Cv. 1075 (S.D.N.Y. May 25, 2021) (finding evidence of "a series of inhumane and potentially dangerous conditions" at the MDC), and judicial ire, *see, e.g.*, Sent'g. Tr., *United States v. Morgan*, 19 Cr. 209 at 37 (S.D.N.Y. May 5, 2020) (Berman, J., noting: "I've personally become acutely aware of the deficiencies at . . . the MDC.").

Yet nothing in the MDC's past can compare to its brutal conditions during the COVID-19 pandemic. Courts have rightly noted that federal detainees in New York endured "terrible circumstances" throughout this pandemic. *See, e.g.*, Sent'g. Tr. at 21, *United States v. Brito*, 20 Cr. 63 (S.D.N.Y. Jan. 13, 2021). Mr. Rosado is no exception. Like every MDC detainee, Mr. Rosado has spent almost his entire incarceration on lockdown. *See* Ex. A. During lockdown, he was confined to his cramped concrete cell for nearly 24 hours per day with the only exception to take showers. He could not have family visits or even legal visits to keep himself connected to the outside world. Even meals were given to him through his cell door -- almost always cold bologna sandwiches.

While Mr. Rosado had hoped that the lockdowns ended indefinitely as the COVID-19 pandemic appeared to be winding down, on December 27, 2021, MDC began a new lockdown in response to the omicron variant passing through the facility. The repeated lockdowns has caused Mr. Rosado to experience anxiety and depression. Mr. Rosado has endured the type of incarceration normally reserved for terrorists and mass murderers at facilities like the ADX Supermax in Florence, Colorado.

Mr. Rosado has, nonetheless, persevered during his time at MDC. While programming at MDC was cancelled for the duration of the pandemic, Mr. Rosado did not allow that to prevent him from finding programming of his own from outside resources. Indeed, Mr. Rosado worked on a weekly basis with social workers in our office since his initial incarceration. Most recently, Mr. Rosado has been working with Emma Famili, a social work intern, to "address the

circumstances surrounding the offense conduct" by "identifying healthy coping strategies for dealing with his trauma." Ex. G, Letter of Emma Famili. As Ms. Famili explains, Mr. Rosado found outside programming on his own despite the lack of programming at MDC: "[t]hrough his own agency, Mr. Rosado actively sought out programming for personal growth, education, and rehabilitation." *Id.* For example, Mr. Rosado "has earned a certificate in healthy relationship through the psychology department as well as a healthy living certificate, a GED tutor certificate, and completed the Gospel of John bible study course." *Id.*; Ex. H, Certificate. Additionally, Ms. Famili worked with Mr. Rosado on his completion of two evidence-based cognitive life skills courses – personal responsibility and offender correction courses – through the American Community Corrections Institute. *Id.* Even with the little programming that the facility has provided during the year and a half of Mr. Rosado's incarceration, he has taken advantage by completing a tutor training program and a recreation and leisure journal program. *See* Ex. I, BOP Education Records. All the while, Mr. Rosado has maintained a pristine disciplinary record during particularly challenging times. *See* Ex. J, BOP Disciplinary Records.

Despite the pain these restrictions inflicted on detainees, they did little to slow the virus. At the time Mr. Rosado entered BOP custody in December 2020, the MDC reported 113 active COVID cases amongst its detainees. *See* Off. Inspector Gen. U.S. Dep't Just., Facility-Level BOP COVID-19 Trends *available at* https://experience.arcgis.com/experience/ ab22fb4c564e4f4b986e257c685190e8/page/Facility-Case-Trends/?data_id=dataSource_4-0%3A60%2B159&views=Inmate-Case-Data. That number is astonishing -- it is nearly one-and-a-half times more cases per inmate than the MCC had at its peak. *See id.* An inspection by the DOJ Inspector General revealed the culprit: PPE. *See* Off. Inspector Gen. U.S. Dep't Just., *Remote Inspection of Metropolitan Detention Center Brooklyn*, 3-5 (November 2020) available at https://oig.justice.gov/reports/remote-inspection-metropolitan-detention-center-brooklyn. The MDC was sorely lacking in personal protective equipment needed to contain the virus. *See id.* While MDC officials claimed that the institution had sufficient PPE, 90% of the MDC's staff told the Inspector General's Office that was not the case. *See id.* The virus tore through the MDC, and infected hundreds of detainees.

Mr. Rosado's time at the MDC warrants a significant downward variance. This Court has held that the conditions of harsh pandemic-era detention should be considered during sentencing. *See United States v. Cirino*, 19 Cr. 323 (S.D.N.Y. July 17, 2020); *United States v. Marmolejo*, 20 Cr. 1 (S.D.N.Y. Feb. 3, 2021). As Your Honor noted in *Cirino*,

> [I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons.

Many judges across this district have held the same. *See, e.g.,* Sent'g. Tr., *Brito*, 20 Cr. 63 at 21 (Gardephe, J.); Sent'g. Tr. at 17, *United States v. Rodriguez*, 19 Cr. 817 (S.D.N.Y. Oct. 6, 2020) (Kaplan, J.); Sent'g. Tr. at 40, *United States v. Mitchell*, 13 Cr. 752 (S.D.N.Y. Aug. 5, 2020) (Failla, J.); Sent'g. Tr. at 24, *United States v. Diaz*, 20 Cr. 305 (S.D.N.Y. Feb. 25, 2021) (Cote, J.); Sent'g. Tr. at 41, *United States v. Newton*, 18 Cr. 373 (S.D.N.Y. Sep. 25, 2020) (Sullivan, J.);

Sent'g. Tr. at 31, *United States v. Mihai*, 19 Cr. 651 (S.D.N.Y. Feb. 24, 2021) (Swain, J.); Sent'g. Tr. at 25-26, *United States v. Rivera*, 16 Cr. 66 (S.D.N.Y. May 11, 2020) (Torres, J.); Sent'g. Tr. at 24, *United States v. Berber*, 18 Cr. 703 (S.D.N.Y. Jun. 11, 2020) (Crotty, J.).

The logic behind giving downward variances to defendants who have suffered pandemic-era detention is obvious -- each day they have served has been more punitive than a normal day in jail, and should therefore count for more time. *See* Sent'g. Tr. at 17, *United States v. Gonzalez*, 18 Cr. 669 (S.D.N.Y. Apr. 2, 2021) (Oetken, J., holding that pandemic-era incarceration is "the equivalent of either time and a half or two times what would ordinarily be served." ); *see also* Sent'g. Tr. at 23-24, *United States v. Garcia et al.*, 20 Cr. 27 (S.D.N.Y. Jul. 10, 2020) (Koeltl, J., explaining that "imprisonment contemplated by the guidelines would be imprisonment under normal circumstances, but [pandemic-era] imprisonment has been anything but normal circumstances."). Even the government has admitted that "a day spent in prison under the conditions occasioned by the pandemic is not equivalent to an ordinary such day." Gov't Sent'g Submission at 7, *United States v. Garcia*, 19 Cr. 593 (S.D.N.Y. Nov. 28, 2020) (*citing United States v. Harris*, 2020 WL 5801051, at *4 (S.D.N.Y. Sept. 29, 2020)).

A significant downward variance is similarly warranted here. At the time of this filing, Mr. Rosado has spent 16 months in federal custody. As discussed above, his detention has been grueling and has been far more punitive than 16 months of normal incarceration. While the rest of the world seems to be gradually returning to pre-pandemic times, the conditions and lack of programming at jails tell a very different story. Indeed, it is unclear how long jails will continue operating with lockdowns, whether the result of the pandemic or lingering staffing shortages. As such, it is likely that BOP will continue to suffer the same poor conditions of confinement for the foreseeable future as Mr. Rosado serves the remainder of his sentence.

## Conclusion

Steve Rosado is deeply sorry for his actions. Fifteen years in prison is a serious penalty in any case. Upon consideration of all the § 3553(a) factors, it is more than sufficient in this case. Mr. Rosado has demonstrated his genuine remorse, commitment to change, and there is a strong likelihood that he will be successful in treatment once he is released.

This is a tragic case. It is the case of a deeply depressed and traumatized person who figured out how to contain his demons until the isolation of the pandemic deprived him of the very tools he had relied upon to keep those demons at bay. Given these unfortunate circumstances that led him here today, the defense joins with Mr. Rosado, his family, and friends and respectfully requests the Court sentence him to 15 years in prison. Any longer period of incarceration is not warranted considering the crimes committed and the mitigating factors described above.

Thank you for your consideration of this request.

                                                Sincerely,

                                                *Marisa K. Cabrera*
                                                _____
                                                Marisa K. Cabrera
                                                Assistant Federal Defender
                                                52 Duane St., 10th Floor
                                                New York, NY 10007

Cc: AUSA Jonathan Bodansky (via ECF)