

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 31, 2022

**BY ECF**

The Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Steve Rosado*, **21 Cr. 3 (JSR)**

Dear Judge Rakoff:

    The Government respectfully submits this letter in advance of defendant Steve Rosado's sentencing in the above-referenced case on April 7, 2022.

    The defendant, having pleaded guilty to attempting to entice two minors to engage in illegal sexual activity, and to attempting to receive child pornography after having been previously convicted of sex offenses involving minors, is subject to a mandatory minimum term of imprisonment of 15 years and a maximum term of life.  As discussed below, given the seriousness of the defendant's instant offenses, the defendant's prior sexual abuse of children, and the fact that at the time of the instant offenses, the defendant was a registered sex offender, the Government submits that a sentence within the applicable United States Sentencing Guidelines (the "Guidelines") range of 292 to 365 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing in this case.

**I.**    **Background**

    **A.**    **The Instant Offenses**

    On November 29, 2020, an undercover law enforcement agent (the "UC"), posing as the mother of a twelve-year-old girl ("Minor-1") and a nine-year-old girl ("Minor-2"), initiated a series of conversations with the defendant – a twice-convicted sex offender – via Kik Messenger, an online messaging service.  (PSR ¶ 13.)[1]  The UC and the defendant later exchanged telephone numbers, and they proceeded to have ongoing communications over the next week via Kik, text message, and numerous lengthy telephone conversations that were recorded by the UC.  (*Id.*; Compl. ¶ 4(a).)

---

[1] "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Department ("Probation"), revised March 25, 2022.

Throughout their communications, the defendant repeatedly expressed, in graphic detail, his desire to engage in sexual activity with the UC's purported children. (PSR ¶ 14.) For example, on November 30, 2020, the defendant and the UC had the following exchange:

| | |
|---|---|
| Defendant: | Will [Minor-1] be a very good girl during bed time with me being her new daddy? |
| UC: | I think once she sees what a good daddy you are and gentle she will be very loving |
| Defendant: | Once she sees I treat . . . everyone good in our close family, she will be receptive to handling my needs just like her mommy? |
| UC: | I think she will like pleasing a good daddy like u |
| | \*\*\* |
| | You know how to treat little good girls – they are delicate |
| Defendant: | I hope so, I'd be so happy with being taken care of . . . yes I'll be gentle and go very slow with our little angels and I'd especially go bareskin so we both feel the best from taking care of each other in bed. I hope you can accommodate that sweetie with our little girls while I care for all of you |
| | \*\*\* |
| | And yes I'll be sure gentle with both of our angels. I'll try to move gentle and slowly in our oldest angel when she takes care of me and let her know how happy she made me after I fill her up with my warm love juices inside her beautiful body. |

(*Id.*; Compl. ¶ 4(b).)

During these online and telephonic communications, the defendant and the UC arranged to meet for a drink at a bar in Manhattan on the evening of Monday, December 7, 2020, with the understanding that they would return to the UC's apartment afterward and the defendant would then engage in sexual activity with at least the UC's 12-year-old daughter. (PSR ¶ 15.) For example, the defendant and the UC had the following exchange on November 30, 2020:

> Defendant: We can meet up and have a nice lil dinner or drinks
>
> And then you can introduce me to the girls
>
> And we can see about asleep over to get settled in to our new routine together . . . all of us
>
> \*\*\*
>
> So doing the sleep over I know the oldest will be ready for what I want . . . I think the little one will just be ready for just some things at first.
>
> \*\*\*
>
> UC: And yeah [Minor-1] might be ready [d]epending on what you wanna do?
>
> Defendant: With [Minor-1] it's all the way but I'll be gentle and go slow with her

(Compl. ¶ 4(c).)

The defendant continued to confirm the plan throughout the week, writing on December 3, 2020: "So Monday with you me and the girls that set in stone hopefully?" (PSR ¶ 16.) That same day, he also wrote: "I can't wait to see you and [Minor-1] in action . . . I bet she will make you ever proud and be able to take me in her mouth and pussy very much like her mommy." (*Id.*)

The defendant and the UC also discussed what they would do if the defendant were to impregnate Minor-1. (*Id.* ¶ 17.) On December 5, 2020, the defendant reassured the UC that he would "love and take care of [his] family forever," saying that they would "discuss it more and try to plan things out." (*Id.*; Compl. ¶ 4(e).) The defendant and the UC had the following exchange that same day:

> UC: Just don't want any questions about her b[e]ing pregnant. We will hafta plan it out about what to do if our angel has ur baby
>
> Defendant: I think she would handle it just great but we can have her give birth in nj and just say she had a teen bf in nj that got her pregnant and raise the baby as our own in nyc. Most hospitals are flooded with covid so she will give birth as another preg teen and everyone will be too swam to ask or care and she would leave right after the

> birth cause the hospital or clinic would need the bed. Or I can find a midwife to do a home birth and see if I can pay them to get a birth certificate and do stuff with no questions.

(PSR ¶ 17; Compl. ¶ 4(e).)

The defendant further attempted to reassure the UC by providing her with his test results for COVID-19 and HIV, writing to the UC on November 30, 2020 that "this way you know I'll fill our lil angels up with clean warm luv juice." (PSR ¶ 18; Compl. ¶ 4(f).)

On December 7, 2020, the defendant and the UC met at the bar in Manhattan as planned. (PSR ¶ 20.) They then exited the bar and began walking toward the UC's purported apartment – where the defendant intended to meet and engage in sexual activity with the UC's young daughters – at which point the defendant was arrested by law enforcement. (*Id.*) At the time of his arrest, the defendant was in possession of gifts for the children – including dolls and a stuffed animal – and an overnight bag containing, among other things, lubricant. The defendant was also in possession of a mobile phone ("Device-1"), which was subsequently searched by law enforcement pursuant to a search warrant. That same day, law enforcement conducted a search of the defendant's residence and recovered additional electronic devices, including a second mobile phone ("Device-2") that was also subsequently searched by law enforcement pursuant to a search warrant.

Device-1 was found to contain communications, sent via Wickr, another online messaging service, in November and December 2020, between the defendant and a 16-year-old girl with whom the defendant was apparently engaging in sexual activity. (*Id.* ¶ 24.) For example, on December 5, 2020, the defendant wrote the following texts, confirming his sexual activity with the female minor and his understanding that she was not yet 17 years old:

> Defendant: Yeah . . . I think we should stop messing with each other sexually and in person at this point . . . We almost got caught a few times and one time definitely due to vampire. I have enjoyed a lot of things we experienced together . . .
>
> Again crappy way to say it but I'm don't want you to get hurt by your dad and I don't see this ended well right now until you decide to leave your dad at 18 or go stay with mister.
>
> Your dad doesn't want you to leave at 18 and maybe he figures by 17 you will leave with mister or someone else.

(*Id.*)

Device-2, in turn, was found to contain communications, sent via Whisper, a third online messaging service, from October 2020 to December 2020, with several individuals who identified themselves as minors.[2] (*Id.* ¶ 25.) In those communications, the defendant discussed having the purported minors move to New York to live with him, so that he could engage in sexual activity with them, impregnate them, and eventually engage in sexual activity with their future children. He also requested that the purported minors send him sexually explicit images of themselves, and on multiple occasions, he received what appeared to be child pornography. (*Id.* ¶ 26.)

For example, on October 30, 2020, the defendant had the following exchanges, via Whisper, with an individual ("User-1") who identified herself to be 16 years old:

| | |
|---|---|
| Defendant: | Hey sweetie. How you been? |
| User-1: | Fine |
| Defendant: | Cool . . . How old r u by the way hun? |
| User-1: | 16. No sorry. 16 |
| Defendant: | Very nice age |
| | \*\*\* |
| | You know if daddy had you right now id be filling you up all bareskin with my warm cum in you at 16? |
| User-1: | Yes |
| Defendant: | That's my good girl |
| | \*\*\* |
| | Daddy wants to see more of you |
| | A lot more |
| User-1: | [Sends Image] |
| | \*\*\* |
| Defendant: | Wish i could see ur pussy |

---

[2] The Government interviewed three of these individuals and confirmed that at least two of them were in fact minor females, and at least one of them was in fact an adult male.

|  |  |
|---|---|
|  | God u r so heavenly |
| User-1: | Sorry falling asleep |
| Defendant: | Let me see ur lil pussy so i can dream about licking and pumping my cock into it babygirl |
|  | *** |
| User-1: | [Sends Image] |
| Defendant: | Thats my good girl |

(*Id.* ¶ 27.)

Similarly, from October 25, 2020 to October 26, 2020, the defendant had the following exchanges with an individual ("User-2") who identified herself to be 14 years old:

|  |  |
|---|---|
| Defendant: | I can take you in and take care of you if you agree to terms |
|  | *** |
| User-2: | terms? |
| Defendant: | The terms are you would have to be my live in gf and id take care of you if you take care of my needs especially in bed . . . us going bareskin having sex . . . All the way . . . No pulling out . . . Could you handle that? Hope we can chat tonight |
|  | *** |
| User-2: | omggg |
|  | i gotta tell u |
|  | i'm only 14 |
| Defendant: | Ok thats great. Id take you in and take good care of you |

(*Id.* ¶¶ 28-29.)

And from October 22, 2020 to October 23, 2020, the defendant had the following exchanges with an individual ("User-3"[3]) who identified herself to be 16 years old:

| | |
|---|---|
| Defendant: | If you were to stay with me there are terms. |
| | The terms are id take care of you if you take care of my needs especially in bed . . . us going bareskin having sex. All the way . . . no pulling out . . . Is that something you could you handle that? |
| User-3: | Idk. I've never had sex before. Hmm |
| Defendant: | Well raw sex every night is part of the terms |
| | \*\*\* |
| User-3: | What if I get prego |
| Defendant: | Then i keep taking care of you and our baby and you keep following what i need you to do so i can keep taking care of both of you. If it is a girl you just let me raise her and we can remain happy together |
| | And if it's a boy |
| | We will try again for a girl |
| User-3: | What would you do with the baby |
| Defendant: | If it's a girl we will raise her as her mommy and daddy . . . hopefully by the time she gets closer your age she will just be as pretty and loving as you someday |
| | You just let me love her [and] raise her as i see fit |
| User-3: | Are you going to have sex with her |
| | Sounds more like I'd be a slave |
| Defendant: | When she gets old enough yes i will |

---

[3] Based on its investigation, the Government believes that User-3 may, in fact, be an adult male.

| | | |
|---|---|---|
| User-3 | | What's old enough |
| Defendant: | | 12-13 |

(*Id.* ¶ 30.)

### B.   The Defendant's Prior Convictions

At the time he committed the offenses outlined above, the defendant was already a registered sex offender, having twice before been convicted of sex offenses involving minors.

In 2004, the defendant was convicted of possessing a sexual performance by a child, in violation of New York State Penal Law § 263.16, and sentenced to six months' imprisonment and 10 years' probation.[4]  (PSR ¶ 67.)  The charges arose out of the defendant's stalking and attempted kidnapping of a 13-year-old girl he met online. (*Id.*)  The defendant, then 22 years old, waited with a present for the victim at a train station on the victim's thirteenth birthday. (*Id.*)  He then kissed her and attempted to pull her onto a subway car with him, but she was ultimately able to escape and report the incident. (*Id.*)  He was subsequently apprehended and charged with attempted kidnapping, sexual abuse, unlawful imprisonment, and endangering the welfare of a child, but during plea negotiations concerning those charges, law enforcement discovered child pornography on a hard drive that had been recovered from the defendant's apartment – and he ultimately pleaded guilty to that offense.[5]

In 2005, the defendant was convicted again, this time of four counts of rape in the second degree, in violation of New York State Penal Law § 130.30(1); four counts of rape in the third degree, in violation of New York State Penal Law § 130.25(2); and two counts of endangering the welfare of a child, in violation of New York State Penal Law § 260.10(1).  (PSR ¶ 68.)  Those charges arose out of the defendant, then 24 years old, having had sexual intercourse approximately 24 times with a 14-year-old female victim. (*Id.*)  The defendant was sentenced to 28 months to 7 years' imprisonment for the second-degree rape counts, two to four years' imprisonment for the third-degree rape counts, and one year imprisonment for the endangering the welfare of a child counts. (*Id.*)

As a result of his prior convictions, the defendant was incarcerated from December 2005 to October 2013.

### C.   Procedural History

On December 8, 2020, the day after his arrest in the instant matter, the defendant was charged by criminal complaint with one count of attempted enticement of a minor to engage in

---

[4] The defendant's probation was subsequently revoked as a result of his 2005 conviction, and he was resentenced to a term of imprisonment of one to three years.  (PSR ¶ 67.)

[5] The information included herein, concerning the defendant's 2004 conviction, comes from both the PSR and a conversation with the Assistant District Attorney who handled the state case.

illegal sexual activity, in violation of 18 U.S.C. §§ 2422(b) and 2 ("Count One"), and one count of committing that offense while being required by law to register as a sex offender, in violation of 18 U.S.C. § 2260A ("Count Two"). (ECF No. 1.) A grand jury returned an indictment (the "Indictment") charging the defendant with those same offenses on January 5, 2021. (ECF No. 5.)

On April 15, 2021, the defendant filed a motion to dismiss the Indictment, arguing that (i) he could not be prosecuted under Section 2260A because his offense did not involve an actual minor, and (ii) the Government's evidence with respect to Count One was insufficient. (ECF Nos. 9-10.) The Court denied the defendant's motion, in its entirety, on June 4, 2021. (ECF No. 13).

On November 1, 2021, a grand jury returned a superseding indictment (the "Superseding Indictment") that included the earlier charges contained in the Indictment, and – on the basis of the evidence recovered from the defendant's electronic devices, following his arrest – additional charges of attempted receipt of child pornography after having been convicted of sex offenses involving minors, in violation of 18 U.S.C. §§ 2252A(a)(2)(B) and (b)(1), and 2 ("Count Three"). (ECF No. 15.) Around that same time, on October 29, 2021 and November 3, 2021, the defendant submitted multiple *pro se* motions – including motions to request a Daubert hearing, to compel disclosure of purported evidence, to appoint a neutral expert witness, and to issue subpoenas – directly to the Court, which the defense subsequently withdrew. (ECF No. 18.) And, on November 12, 2021, the defendant filed, through counsel, a motion to dismiss Count Three of the Superseding Indictment, adjourn the trial, or sever Count Three, and to bifurcate Count Two of the Superseding Indictment from Counts One and Three. (ECF Nos. 20-21.)

On November 22, 2021, two weeks before trial was scheduled to begin and before the defendant's November 12, 2021 motion was fully briefed,[6] the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to Counts One and Three of the Superseding Indictment.

### D.     Guidelines Calculation and Presentence Investigation Report

Pursuant to the Plea Agreement, the parties stipulated that, based on an offense level of 36 and a criminal history category of V, the defendant's applicable Guidelines range is 292 to 365 months' imprisonment. In addition, as a result of his guilty pleas, the defendant is subject to a mandatory minimum term of imprisonment of 15 years.

In its Presentence Investigation Report, Probation concurs with the parties' calculation of the applicable Guidelines range, and it recommends a sentence of 292 months' imprisonment. (PSR at 26.) Probation acknowledges the defendant's "traumatic childhood" and purported "history of mental health issues," but states that those factors "do not diminish the potential danger [the defendant] poses to the community." (*Id.* at 27-28.) Probation notes that the defendant's instant offense was "not limited to possessing or viewing images of child pornography on his computer," but instead involved "actively pursu[ing] sexual encounters with minors" – and that "the instant offense represents the third instance in which [the defendant] has engaged in such conduct," "rais[ing] serious concerns about the safety of the community." (*Id.* at 28.) Probation

---

[6] The Government filed its opposition on November 19, 2021. (ECF No. 24.)

also notes that the defendant has "failed to benefit from prior terms of imprisonment," and that "[d]espite losing his freedom for periods lasting multiple years, [the defendant] voluntarily engaged in the instant offense." (*Id.*) Probation concludes that a sentence of 292 months' imprisonment "acknowledges the mitigating sentencing factors present while still addressing the needs for just punishment and protection of the community." (*Id.*)

## II. Applicable Law

Although the Guidelines are now only advisory, they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any pertinent policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## III. Discussion

The Government respectfully submits that a sentence within the applicable Guidelines range of 292 to 365 months' imprisonment is warranted and appropriate in this case, and necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.

The seriousness of the defendant's offenses can hardly be overstated. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people."); *New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."). Notwithstanding the fact that he was already a registered sex offender, having twice before been convicted of sex offenses involving children, the defendant, then 41 years old, attempted to engage in sexual activity with the UC's purported nine-year-old and 12-year-old daughters. In hundreds of text messages, and hours of recorded telephone calls, the defendant described in graphic detail the various sexual acts that he hoped to engage in with the children on an ongoing basis, as part of their "new routine together," and he took concrete actions in furtherance of his goals – most significantly, traveling to meet with the UC in person, as planned, with gifts for the children, an overnight bag, and lubricant in hand.

Moreover, the defendant's attempt to engage in sexual activity with the UC's children was not an isolated incident. Rather, it was prolonged effort over multiple days, and, more importantly, part of a broader pattern of the defendant trolling the internet in search of minor victims. Indeed, reviews of the defendant's electronic devices following his arrest revealed that he had been communicating with several other individuals who purported to minors – some purporting to be as young as 13 years old – in an ongoing, twisted attempt not only to receive child pornography, but also to persuade the young victims to move to New York to live with him, so that he could then engage in sexual activity with them, impregnate them, and eventually engage in sexual activity with their future children. The defendant's electronic devices further revealed that during this same period, the defendant was engaged in an actual, ongoing sexual relationship with a 16-year-old female victim.

Under any circumstances, this would constitute an extraordinarily serious and disturbing pattern of behavior. It is especially egregious here, however, given that the defendant engaged in it while already a registered sex offender, and after having served nearly eight years in prison for raping a 14-year-old girl, stalking and attempting to kidnap a 13-year-old girl, and possessing child pornography.

Of course, the defendant was apprehended as part of a sting operation, and the UC's purported children were not, in fact, real. That in no way diminishes, however, the seriousness of the defendant's conduct or the danger posed by his behavior.[7] The defendant *believed* the UC's

---

[7] The legislative history of 18 U.S.C. § 2422 "clearly illustrates that Congress intended to impose lengthy mandatory-minimum sentences in cases such as [the instant case], specifically because the attempted sexual enticement of a minor is a very serious crime, regardless of whether there is an actual minor who is victimized." *United States v. Dobrowolski*, 406 F. App'x 11, 13 (6th Cir. 2010) ("[T]he offender's conduct in such a case reflects a real attempt to engage in sexual abuse of a child, and the fact that the target of the effort turned out to be an undercover officer has no bearing on the culpability of the offender, or on the danger he presents to children if not adequately restrained and deterred by criminal punishment." (quoting H.R. Rep. No. 108–66, at 51 (2003))); *see also United States v. Fortner*, 943 F.3d 1007, 1011 (6th Cir. 2019) ("[L]aws designed to root out child predation frequently cover attempt crimes against non-existing children precisely to

children to be real, and he fully intended to have sex with a nine-year-old and a 12-year-old. Had he accomplished his plan, he would have inflicted severe physical, emotional, and psychological damage on two innocent children. Furthermore, although the UC's children were not real, at least some of the defendant's other victims were; indeed, at least two of the individuals with whom he communicated via Whisper were in fact minors – a 14-year-old girl and a 16-year-old girl – and he was meanwhile engaged in ongoing sexual activity with yet another 16-year-old girl. Thus, his crimes had a very real impact on actual children.

A substantial prison sentence, therefore, is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. But a substantial sentence is also necessary to afford adequate deterrence to criminal conduct, both specific and general, and to protect the public from further crimes of the defendant.

Crimes of the sort committed here by the defendant have devastating, lasting effects on minor victims – individuals who are likely to be especially vulnerable and subject to exploitation. They can also be difficult to detect, as minor victims may be embarrassed or hesitant to discuss a perpetrator's conduct with an authority figure. Indeed, had law enforcement not managed to apprehend the defendant through its sting operation, and subsequently gained access to the defendant's electronic devices, it never would have learned of the numerous other victims with whom the defendant had been communicating. It is thus imperative to send a message to all others who may seek to prey on the most defenseless members of our community in this fashion that this conduct will not be tolerated.

It is similarly critical to send a strong message to the defendant himself, and to protect the public from further crimes committed by him. As discussed, not only was the defendant's instant offense conduct extremely serious, but he engaged in that conduct after having been convicted of sex offenses twice already, and after having spent nearly eight years in prison for those offenses. It is evident that his prior period of incarceration did little to deter him from reoffending – egregiously – and there is no reason to believe that another sentence of a comparable magnitude would result in a different outcome. A substantially greater sentence, within the applicable Guidelines range, is thus necessary to have any legitimate hope of deterring the defendant, and to protect the public from a dangerous offender while he is incarcerated.

---

avoid completed crimes against existing children."); *United States v. Slaughter*, 708 F.3d 1208, 1216 (11th Cir. 2013) ("We have consistently sought to . . . reach holdings that aim to protect minors – not make conviction more difficult for crimes that affect them. . . . We cannot say that this stated purpose would be furthered by treating a recidivist sex offender better simply because he enticed somebody he believed to be a child, rather than an actual child." (quotation marks and emendations omitted)).

### IV. <u>Conclusion</u>

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 292 to 365 months' imprisonment. Given the seriousness of the defendant's offense conduct, the defendant's prior sexual abuse of children, and the fact that, at the time of the instant offenses, the defendant was a registered sex offender, the requested sentence would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
Jonathan L. Bodansky
Jane Y. Chong
Assistant United States Attorneys
(646) 957-1800 / (917) 763-3172

cc: Marisa K. Cabrera, Esq.
    Anna R. Schneider, Esq.